UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AL NOOR ALAILI TRADING CO., LLC,

               Plaintiff,                        Case No. 2:23-cv-10084

v.                                       Honorable Susan K. DeClercq
                                          United States District Judge
U.S. DEPARTMENT OF COMMERCE,
et al.,

               Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 25), DISMISSING PLAINTIFF'S AMENDED COMPLAINT (ECF No. 22), AND CLOSING THE CASE**

This case involves Plaintiff Al Noor Alaili Trading Co, LLC ("ANATCO")'s challenge to an agency action that is statutorily exempt from review under the Administrative Procedures Act (APA). So, instead, ANATCO has brought an *ultra vires* claim against the United States Department of Commerce (Commerce) and Commerce's subsidiary agency, the U.S. Bureau of Industry and Security (BIS), asserting that the agencies and their employees exceeded their statutory and regulatory authority and acted contrary to law in taking action that adversely impacted ANATCO. Defendants, however, seek dismissal of ANATCO's complaint, arguing that it has not met the high burden of pleading an *ultra vires* claim. As explained below, this Court will grant Defendants' motion and will

dismiss ANATCO's complaint because ANATCO has not plausibly alleged that Defendants acted *ultra vires* in taking agency action that impacted ANATCO.

## I. BACKGROUND

### A. Statutory and Administrative Framework

In 1979, Congress enacted the Export Administration Act of 1979 (EAA), which "provided significant authority to the President—and to the agencies to which he delegated that authority—to regulate exports to foreign countries and to limit trade 'determined by the President to be against the national interest.'" Jacob Aaron Pagano, *Contrary to National Security: The Rise of the Entity List in U.S. Policy Towards China and Its Role in the National Security Administrative State*, 61 COLUM. J. TRANSNAT'L L. 453, 465–66 (2023) (hereafter "*Contrary to National Security*") (quoting the EEA, Pub. L. No. 96–72 §§ 1–4, 93 Stat. 503, 503–06 (1979)). After the passage of the EAA, Commerce implemented the Export Administration Regulations (EAR) to govern exports from the United States to foreign countries. *See generally* 15 C.F.R. § 730.1 *et seq.*

When the EAA lapsed in 2001, the President implemented Executive Order 13,222 on August 17, 2001, which "continued the EAR under the International Economic Powers Act." Shannon Moloney, *BIS Meets Loper Bright: Rethinking "National Security*," 10 ALR ACCORD 143, 148 (2025) (citing 66 Fed. Reg. 44025); *see also Micei Int'l v. Dep't of Com.*, 613 F.3d 1147, 1150 (D.C. Cir. 2010)

(explaining that the President issued the executive order after finding that "the expiration of the EAA and the resulting absence of an operative export control law" qualified as a national emergency to warrant issuing the executive order).

Then, in 2018, Congress provided a more permanent statutory basis for the regulation and control of exports by passing the Export Controls Reform Act of 2018 (ECRA), which requires BIS to control the export of emerging and foundational technologies "essential to the national security of the United States." 50 U.S.C. § 4817(a)(1)(A). To that end, the ECRA empowers the Secretary of Commerce to control the export of items that can be used for the following purposes:

> (i) the proliferation of weapons of mass destruction or of conventional weapons;
>
> (ii) the acquisition of destabilizing numbers or types of conventional weapons;
>
> (iii) acts of terrorism;
>
> (iv) military programs that could pose a threat to the security of the United States or its allies; or
>
> (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure.

50 U.S.C. § 4811(2)(A).

The ECRA also "requires the Secretary to take various other substantive, licensing, and compliance actions related to export controls," and grants the Secretary broad authority to "undertake any other action as is necessary to carry out this subchapter that is not otherwise prohibited by law." *Changji Esquel Textile Co.*

- 3 -

*v. Raimondo*, 40 F.4th 716, 720 (D.C. Cir. 2022), aff'd, 40 F.4th 716 (D.C. Cir. 2022) (quoting 50 U.S.C. § 4813(a)(16)); *see also* 50 U.S.C. § 4813(a)(5)–(15).

As most relevant to this case, the ECRA also directs Commerce, "in consultation with the Secretary of State, the Secretary of Defense, the Secretary of Energy," and the President, to "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States pursuant to the policy set forth in [50 U.S.C. §] 4811(2)(A)." 50 U.S.C. § 4813(a)(2). The list of foreign persons that are determined to be a threat to national security and foreign policy is often referred to as "the Entity List." *See Changji*, 573 F. Supp. 3d at 108 (explaining the function and purpose of the Entity List).

As it relates to the Entity List, the EAR articulates "[c]riteria for revising the Entity List," and permit Commerce and BIS to add a foreign party to the Entity List "if there is reasonable cause to believe, based on specific and articulable facts" that a foreign party to an export transaction poses a "significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.11(b). The EAR outlines five categories of activities "that could be or represent a significant risk of being contrary to the national security or foreign policy interests of the United States." *Id.* These five categories of activities are:

- 4 -

(1) Supporting persons engaged in acts of terror.

(2) Actions that could enhance the military capability of, or the ability to support terrorism of governments that have been designated by the Secretary of State as having repeatedly provided support for acts of international terrorism.

(3) Transferring, developing, servicing, repairing or producing conventional weapons in a manner that is contrary to United States national security or foreign policy interests or enabling such transfer, service, repair, development, or production by supplying parts, components, technology, or financing for such activity.

(4) Prevention of the accomplishment of an end use check conducted by or on behalf of BIS or the Directorate of Defense Trade Controls of the Department of State by:

  (i)   The entity or persons that own or control an address that presents a high diversion risk precluding access to; refusing to provide information about; or providing false or misleading information about parties to the transaction or the item to be checked. The conduct in this example includes: expressly refusing to permit a check; providing false or misleading information; or engaging in dilatory or evasive conduct that effectively prevents the check from occurring or makes the check inaccurate or useless. A nexus between the conduct of the party or address that presents a high diversion risk to be listed and the failure to produce a complete, accurate and useful check is required, even though an express refusal by the party to be listed is not required; or

  (ii)  A sustained lack of cooperation by the host government to schedule and facilitate the completion of an end-use check of entities identified on the Unverified List pursuant to § 744.15, resulting in sufficient concern such that the End–User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the entity and the possible imposition of license conditions or license denial enhance BIS's ability to prevent violations of the EAR.

(5) Engaging in conduct that poses a risk of violating the EAR when such conduct raises sufficient concern that the End–User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the party and the possible imposition of license conditions or license denial enhances BIS's ability to prevent violations of the EAR.

15 C.F.R. § 744.11(b)(1)–(5).

Once a foreign entity has been placed on the Entity List, an exporter may not export specified items to that entity (or any entity on the Entity List) unless it obtains a special license to do so. *See* 15 C.F.R. § 744.11(a); *see also* Pagano, *Contrary to National Security*, 61 COLUM. J. TRANSNAT'L L. at 468. But once a foreign entity is placed on the Entity List, attempts to obtain a license are often reviewed with a presumption of denial at best, and, at worst, a policy of denial subject to some specific exceptions. *See* 15 C.F.R. § 744; 15 C.F.R. § Pt. 744, Supp. 4 (Nov. 2025). A foreign entity, however, may be removed from the Entity List if the entity "is no longer engaged in the activities" that caused it to be added to the Entity List, "is unlikely to engage in such activities in the future, or if [the entity] is no longer at significant risk of acting contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.11.

Notably, the ECRA also specifies that "the functions exercised under this subchapter shall not be subject" to the judicial review methods of the APA. 50 U.S.C. § 4821(a). In this way, any agency decisions to add or remove parties to the Entity List are not subject to APA judicial review. *See id.*

- 6 -

**B. This Case**

ANATCO is a company located in Dubai, United Arab Emirates that "purchase[d] and resold" spare civilian aircraft parts "at the onset of the global COVID-19 pandemic." ECF No. 22 at PageID.119–20.

On March 29, 2020, a BIS export control officer (ECO) contacted ANATCO to perform an end-use check[1] regarding some of the parts ANATCO had sold to a buyer. *Id.* at PageID.125.

At that point, an ANATCO employee provided the ECO with information that was inconsistent with ANATCO's previous representations, which is that the parts it had sold "would be used in a gas turbine for desalinization at the Dubai Electric and Water Authority" (DEWA). *Id.* But when the ECO contacted DEWA, DEWA said it did not have turbines that would work with the parts ANATCO had sold. *Id.* So on April 29, 2020, ANATCO responded to the ECO's communication by saying it "would provide certain documents requested by the ECO." *Id.* But ANATCO did not provide such documentation to the ECO.

ANATCO acknowledges Defendants' assertions that they made two additional attempts to perform the end-use checks on May 7, 2020 and July 6, 2021, both of which Defendants say were not successful. *Id.* at PageID.125–26. But—

---

[1] End-use checks are regularly utilized by Commerce and BIS to identify the end user or the person that an exporter sold a regulated item to, in order to ensure that the buyer is not a restricted party.

contrary to Defendants' assertion—ANATCO says that it responded to the issues and concerns raised by Defendants and provided the required documentation which "substantiate[d] the purchase and resale of the industrial parts and commercial aircraft parts." *Id.* at PageID.126. To that end, ANATCO admits that DEWA was not the purchaser of the spare parts, but that DEWA being listed as the purchaser was merely an error by ANATCO. *Id.* at PageID.126–27.

On June 30, 2022, Defendants published a final rule which placed ANATCO on the Entity List. *Id.* at PageID.123; *see also* 87 Fed. Reg. 38920, 38922 (June 30, 2022). In the published rule, Defendants explained that ANATCO was placed on the Entity List under 15 C.F.R. § 744.11(b) "for preventing the accomplishment of an End Use Check (EUC) by precluding access to, refusing to provide information to, and/or providing false or misleading information about parties to the transaction or the item to be checked." 87 Fed. Reg. at 38922. The published rule explains that because of ANATCO's placement on the Entity List, a license is required to export an item subject to the EAR to ANATCO. *Id.* However, the published rule notes that any license application filed relating to ANATCO will be reviewed under a presumption of denial. *See id.*

- 8 -

Just over six months later, ANATCO filed a complaint against Commerce and its Secretary, BIS and its Secretary and Undersecretary, and two BIS employees.[2] ECF No. 1. In its original complaint, ANATCO appeared to believe that Defendants placed ANATCO on the Entity List because of a "mix-up misunderstanding regarding" the completion of a Federal Aviation Administration (FAA) form that ANATCO received when it purchased an "Aircraft Emergency Blow Down Bottle" from an American supplier. *Id.* at PageID.6.

In March 2023—two months after ANATCO filed its complaint—Defendants sent a letter to ANATCO explaining that ANATCO was not placed on the Entity List because of the FAA form, but because ANATCO "prevented an end-use check during the time of the onset of the global COVID-19 pandemic." ECF No. 22 at PageID.124; *see also* ECF No. 25 at PageID.166–67 (explaining that Defendants sent the letter "[t]o correct [ANATCO's] misunderstanding").

Shortly after ANATCO received Defendants' March 2023 letter, the Parties stipulated to extend Defendants' response deadline several times, ECF Nos. 8–11, before eventually submitting a joint motion to stay this case until ANATCO had completed outstanding end-use checks and until the End-User Review Committee (ERC) made a final determination about whether ANATCO should be removed from

---

[2] The two BIS employees ANATCO named as defendants are Matthew Borman, the Deputy Assistant Secretary for Export Administration, and Joseph Cristofaro, the End-User Review Committee Chair. *See* ECF No. 1 at PageID.5.

the Entity List. ECF No. 12 at PageID.99–100. This Court granted the Parties' motion, ECF No. 13, and the Parties' submitted regular joint status reports, *see* ECF Nos. 14–20. In the Parties' December 2024 status report, they reported that that the ERC denied ANATCO's request to be removed from the Entity List on October 22, 2024, and that ANATCO would be filing an amended complaint. ECF No. 20 at PageID.116.

ANATCO filed its amended complaint on January 23, 2025. ECF No. 22. In its amended complaint, ANATCO provided details of what occurred between the filing of its initial complaint in 2023 and the present, *see id.* at PageID.123–32, but the underlying claim remained the same. Six weeks later, Defendants filed a motion seeking dismissal of ANATCO's sole *ultra vires* claim under Civil Rule 12(b)(6), or transfer of the action to the Unted States District Court for the District of Columbia under Civil Rule 12(b)(3) and 28 U.S.C. § 1406(a).  ECF No. 25.

## II. LEGAL STANDARD

Under Civil Rule 12(b)(6), a pleading fails to state a claim if its allegations do not support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) motion, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" but must provide "more than

labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do."). The complaint is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also 16630 Southfield Ltd. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013). Otherwise, the Court must grant the motion to dismiss. *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

Defendants argue that ANATCO's amended complaint should be dismissed for two separate reasons: (1) because ANATCO's complaint does not contain sufficient allegations to give rise to an *ultra vires* claim, ECF No. 25 at PageID.157; and (2) because "this Court is an improper venue for ANATCO's claims."[3] *Id.* ANATCO opposes both bases for dismissal. ECF No. 27 at PageID.198–213. As explained below, ANATCO's complaint will be dismissed because it does not sufficiently allege an *ultra vires* claim.

As recently explained by United States District Judge John D. Bates:

[An *ultra vires* claim is a] non-statutory form of review [that] derives from courts' equitable authority to "reestablish the limits on" executive authority "[w]hen an executive acts *ultra vires*." [] *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *[see also] Aid Ass'n for*

---

[3] Defendants also argue that even if this Court finds dismissal is not warranted, the case should be transferred to the District of Columbia under 28 U.S.C. § 1406(a). ECF No. 25 at PageID.145, 181.

*Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172–1733 (D.C. Cir. 2003). But this "is a doctrine of last resort, 'intended to be of extremely limited scope.'" *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007) (quoting Griffith v. *Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 778 F. Supp. 3d 56, 88 (D.D.C. 2025).

"To prevail on an *ultra vires* claim, the plaintiff must establish three things: '(i) [that] the statutory preclusion of review is implied rather than express; (ii) [that] there is no alternative procedure for review of the statutory claim; and (iii) [that] the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *Changji Esquel Textile Co*, 40 F.4th at 722 (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)). To satisfy the third requirement—which the D.C. Circuit has noted is "especially demanding"—the plaintiff must establish that the agency misconstructed a statute, "disregard[ed] a specific and unambiguous statutory directive," or "violate[d] some specific command of a statute." *Id.* (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). Indeed, when an agency is able to "justify its action by reference to applicable provisions of" a statute, there cannot be a "patent violation of its authority." *Greater Detroit Res. Recovery Auth. v. U.S. E.P.A.*, 916 F.2d 317, 323 (6th Cir. 1990).

As the D.C. Circuit noted, because of this "very stringent standard," an *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

In this case, even assuming that ANATCO's complaint pleads facts which satisfy the first two elements of an *ultra vires* claim, it is clear that ANATCO's complaint "fall[s] far short of satisfying the 'especially demanding' third prong of the *ultra vires* reviewability test." *Rusnak v. United States*, No. 25-292, 2026 WL 809985, at *11 (D.D.C. Mar. 24, 2026) (quoting *Changji Esquel Textile Co*, 40 F.4th at 722).

Indeed, despite ANATCO's conclusory statement that Defendants exceeded their statutory and regulatory authority in issuing the placing ANATCO on the Entity List, ANATCO has not alleged any facts which support this assertion. *See* ECF No. 22 at PageID.133–39.

To the contrary, ANATCO alleges that it incorrectly identified the end user of several parts it purchased from a United States exporter in March 2020. *See id.* at PageID.125–26. ANATCO further alleges that it did not adequately respond to the ECO's communication in May 2020 and July 2021. *Id.* at PageID.126–27 (noting that "ANATCO regrets that it was unable to have a company representative speak with the ECO"). And ANATCO alleges that Defendants placed ANATCO on the

- 13 -

Entity List *because of* its failure to respond to the ECO's communication. *See generally* ECF No. 22.

Considering these facts, Defendants' addition of ANATCO to the Entity List was well within the bounds of the ECRA's statutory grant of authority. Indeed, Section 4813(a)(16) empowers the Secretary to "undertake any other action as necessary to carry out this subchapter that is not otherwise prohibited by law." 50 U.S.C. § 4813(a)(16). And adding entities that prevent an end-use check to the Entity List "comfortably falls within this provision" of the ECRA. *See Changji Esquel Textile Co.*, 40 F.4th at 723. Indeed, "although Section 4813(a)(2) does not independently and affirmatively authorize the Secretary to list entities for [preventing or not cooperating with end-use checks], neither does it affirmatively prohibit [the Secretary] from doing so." *Id.* And listing entities for preventing end-use checks may not be fairly described as being "otherwise *prohibited* by law," such that it would be prohibited under the ECRA. 50 U.S.C. § 4813(1)(16) (emphasis added). In this way, ANATCO has not pleaded facts which show that Defendants misconstrued a statute, "disregard[ed] a specific and unambiguous statutory directive," or "violate[d] some specific command of a statute" when it added ANATCO to the Entity List for preventing the end-use check from occurring by failing to respond to Defendants' repeated requests for information. *Changji Esquel Textile Co.*, 40 F.4th at 722; *see also* 15 C.F.R. § 744.11(b)(4) (noting that such

- 14 -

activities could be a significant risk contrary to the national security or foreign policy interests of the United States).

ANATCO offers a list of explanations and excuses for why it did not initially respond to the EOC's communications regarding end-use checks. *See* ECF No. 22 at PageID.136–39. And some of these explanations are certainly understandable. But no matter how legitimate ANATCO's explanation, it does not alter the legal conclusion that Defendants acted within their statutory authority when placing ANATCO on the entity list after ANATCO—perhaps unintentionally—evaded attempted end-use checks. *See* 15 C.F.R. § 744.11(b)(4).

Accordingly, because ANATCO has not pleaded facts to satisfy the third prong of the *ultra vires* review test, Defendants' motion to dismiss, ECF No. 25, will be granted and ANATCO's amended complaint, ECF No. 22, will be dismissed. *See Changji Esquel Textile Co.*, 40 F.4th at 722. Because this Court has concluded that dismissal is proper, it need not address Defendants' alternative argument that ANATCO's complaint should be transferred to the United States District Court for the District of Columbia.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss, ECF No. 25, is **GRANTED**.

Further, it is **ORDERED** that Plaintiff's Amended Complaint, ECF No. 22,

is **DISMISSED**.

**This is a final order and closes the above-captioned case.**

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: March 27, 2026

- 16 -